## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE DHB INDUSTRIES, INC. DERIVATIVE LITIGATION | ) ) ) ) | Case No. CV-05-4345 (JS) (ETB) |
| _____ | ) | |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | |
| _____ | ) | |

**DECLARATION OF BRIAN J. ROBBINS IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT AND APPROVAL OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

1.      I am an attorney duly licensed to practice before all of the courts of the State of California.  I am a partner at the law firm of Robbins Umeda & Fink, LLP ("RUF") and Court-appointed Co-Lead Counsel for plaintiff Alvin Viray ("Derivative Plaintiff") in the above-captioned consolidated derivative action (the "Derivative Action").  I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.      I make this Declaration in support of Derivative Plaintiff's Motion for Final Approval of Settlement, including payment of Plaintiff's Counsel's Attorneys' Fees and Reimbursement of Expenses ("Motion").

## I.      INTRODUCTION AND OVERVIEW OF THE DERIVATIVE ACTION

3.      This is a consolidated shareholder derivative action brought on behalf of DHB Industries, Inc. ("DHB" or the "Company" or "Nominal Defendant") against certain of its former officers and members of the Company's Board of Directors ("Board") for violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between April 2004 and the present ("Relevant Period").

4.      DHB is comprised of two divisions: DHB Armor Group and DHB Sports Group.[1] DHB Armor Group consists of Point Blank Body Armor, Inc. ("Point Blank") and Protective Apparel Corporation of America ("PACA"), engaged in the development, manufacturing and distribution of advanced bullet and projectile resistant garments, bullet resistant and fragmentation vests, bomb projectile blankets, and related ballistic accessories and technologies for the United States Military and Law Enforcement Agencies. DHB Armor Group accounts for 98% of DHB's revenues.

5.      The Complaint alleged that the Individual Defendants[2] caused DHB to issue improper statements about DHB's product quality and business prospects of the Company's bullet resistant body armor products and related contracts. Contrary to Defendants' continual assurances of product quality, DHB's vests suffered from material quality problems and DHB's Tactical Interceptor vests continually failed to meet military contract specifications. The complaint alleges Defendants were aware of the serious quality issue with both the DHB Zylon® bulletproof vests and the DHB Interceptor vests.

6.      The Complaint alleged that prior to disclosing these adverse facts to the investing public: (i) Individual Defendants caused or allowed Brooks to use DHB to enrich himself and his family through self-dealing transactions at the expense of the Company; and (ii) certain insiders sold over 10 million of their personally-held shares of DHB stock valued at more than $201 million to the unsuspecting public.

7.      On November 30, 2004, DHB's Chief Operating Officer Hatfield signed a waiver constructively acknowledging that DHB vests failed to meet the Marine Corp's minimum test standards. On August 30, 2005, the truth regarding the Company's material omissions and

---

[1] All factual information is derived from Verified Shareholder Derivative Complaint and Jury Demand (the "Complaint").

[2] "Individual Defendants" means Jerome Krantz ("Krantz"), Gary Nadelman ("Nadelman"), Gary Chasin ("Chasin"), Barry Berkman ("Berkman"), David H. Brooks ("Brooks"), Larry Ellis ("Ellis"), Dawn M. Schlegel ("Schlegel") Sandra Hatfield ("Hatfield")  and collectively with DHB ("Defendants").

misstatements was revealed when the Individual Defendants caused or allowed DHB to issue a press release announcing that it had discontinued the use of Zylon® in its bullet resistant products due to the National Institute of Justice's ("NIJ") decision to revoke the NIJ's previously issued certifications of all vests containing Zylon® in the marketplace.

8.     Following the August 30, 2005 press release, the Company's market capitalization was devastated by over 24% as its share price fell from $6.66 to $5.10 per share, a far cry from the all-time high share price of over $20. As a result of the discontinued sales of Zylon® based vests and prospects in 3Q:05, DHB had to record $60 million charge to write down its Zylon® inventory and replace its Zylon® containing bullet-resistant products. Then, on March 17, 2006, the Company announced that it may have to restate its financial results for certain periods of 2005 due to "inaccurate inventory records" and potential errors in "estimates of the cost of the Voluntary Replacement Program for Zylon®-containing armor products that the Company announced in the third quarter of 2005."

## II.    PROCEDURAL HISTORY OF THE DERIVATIVE ACTION

9.     On and after September 9, 2005, multiple actions were filed in the Court as class actions on behalf of persons who purchased the publicly traded shares of DHB between approximately November 18, 2003 and August 29, 2005, inclusive, alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§78(j) (b) and 78(t)). On January 31, 2006, the Court consolidated the class actions filed as *In re DHB Industries, Inc. Securities Litigation*, No. CV 05-4296 and appointed RS Holdings, NECA-IBEW Pension Fund (the "Decatur Group") and George Baciu as Lead Plaintiffs (the "Class Plaintiffs") pursuant to provisions of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and approved the Class Plaintiffs' choice of Coughlin Stoia Geller Rudman & Robbins LLP and Labaton Sucharow & Rudoff LLP as Co-Lead Counsel.

10.     On and after September 14, 2005, multiple actions were filed in the Court as derivative actions on behalf of DHB. The complaints in the derivative actions generally allege

causes of action for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment.

11.    In November 2005, Derivative Counsel moved for a temporary restraining order and a preliminary injunction imposing a constructive trust over proceeds related to the insider trading of DHB stock.  On November 9, 2005, the Court denied the request for a temporary restraining order, and deferred ruling on the preliminary injunction.

12.    On January 31, 2006, the Court consolidated the derivative actions filed as *In re DHB Industries, Inc. Derivative Litigation*, No. CV 05-4345.  Also, after extensive briefing and oral arguments, the Court appointed Robbins Umeda & Fink, LLP and Law Offices of Thomas G. Amon as Co-Lead Counsel in the Derivative Action.

13.    On March 20, 2006, after extensive investigation, Derivative Plaintiff filed the 96 page, 185 paragraph Complaint alleging on behalf of DHB claims against the Individual Defendants for breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment based on allegations that the Individual Defendants, among other things, with knowing or extreme recklessness issued, or caused DHB to issue, a series of improper and misleading statements regarding: (a) the Company's then-current operating condition and its future prospects; and (b) the quality and safety of DHB's body armor products. The foregoing conduct caused DHB to suffer damages.

14.    On May 4, 2006, DHB and the Individual Defendants, in a 35 page motion, moved to dismiss the Derivative Complaint based on the grounds that no demand was made upon the Board and Derivative Plaintiff did not adequately plead his causes of action.

15.    On June 19, 2006, Derivative Plaintiff filed a 35 page Opposition, after extensive research and revisions.

## III.    THE SETTLEMENT, PRELIMINARY APPROVAL AND NOTICE

16.    Beginning in the summer 2006, the parties engaged in arm's-length settlement discussions.

17.    On November 30, 2006, the Settling Parties entered into the Stipulation.[3]   The Stipulation is contingent upon final approval of this Court and entry of the Final Order and Judgment Approving Settlement.   The specific terms and conditions of the Settlement applicable to the Derivative Action include substantial corporate governance enhancements that will increase the value of DHB, make the Board more responsive to shareholders and assist in preventing the type of conduct alleged in the Derivative Action from recurring.   For example, the Settlement requires the Board to administer a corporate compliance program and establish procedures to further facilitate stockholder communication with the Board.   Furthermore, the Chairman and Chief Executive Officer's ("CEO") performance is to be evaluated annually and as a regular part of any decision in regards to their respective compensation.   Also, as part of the Settlement, the founder of DHB, David H. Brooks, resigned from the Board of Directors of DHB and from all of the other positions held by him in DHB.   Also, Directors Cary Chasin, Gary Nadelman and Barry Berkman were replaced as Board members.

18.    On December 15, 2006, Derivative Plaintiff filed a Motion for Preliminary Approval of Derivative Settlement.

19.    On January 19, 2007 and May 29, 2007, this Court held hearings on whether to preliminarily approve the Settlement.   At the preliminary approval stage, the Court had before it objections to the settlement, including its preliminarily approval.

20.    On July 3, 2007, after extensive briefing and oral argument, the Court preliminarily approved the Settlement and directed that the Notice of Pendancy and Proposed Settlement of Derivative Action and the Summary Notice of Proposed Settlement of Derivative Action be mailed by first class mail to DHB shareholders and published, respectively.   The notice advised DHB shareholders that a hearing to determine whether the proposed settlement should be approved would be held on October 5, 2007.

---

[3] All capitalized terms shall have the same definition as set forth in the Stipulation of Settlement ("Stipulation") previously filed with this Court.

21.    On or before July 18, 2007, the Notice Administrator sent 130 notice packets to DHB shareholders of record. *See* Declaration of Carole K. Sylvester Re A) Mailing of the Notice of Pendancy and Proposed Settlement of Derivative Actions and the Proof of Claim and Release Form; and B) Publication of the Summary Notice filed on September 26, 2007.   The Notice Administrator also sent a cover letter with the Notice to 80 entities, most of which were brokerage houses. *Id.* These entities commonly hold securities in "street name" as nominees for the benefit of their customers who are the beneficial purchasers of the securities. *Id.* The letter advised the nominees of the pending action and requests their cooperation in forwarding the Notice to the beneficiary. *Id.* In addition, on July 20, 2007 the Notice Administrator caused noticed to be published in the *Investor's Business Daily*, and their website (www.gilardi.com). *See id.*

22.    In response to correspondence or inquiries from shareholder and/or nominees an additional 11,282 Notices were mailed. *Id.* To date, the Notice Administrator has mailed 11,412 notice packets to DHB shareholders. *Id.*

23.    The deadline for DHB shareholders to object to this Settlement was September 21, 2007.  To date, Derivative Counsel is aware of only a small amount of objectors.[4]  The objectors claim that the settlement process was flawed, the notice was insufficient, that more money should have been returned to DHB, and the defendants should not have been released from liability.  The objectors, however, fail to consider the difficulty in prosecuting a derivative action, the substantial benefit of the corporate therapeutics and the wisdom in securing a definite benefit to DHB now, as opposed to a risky and costly trial.  Further, the objectors represent a very small portion of DHB stockholders, reporting to hold only .06% of DHB's common stock.

## IV.    THE SETTLEMENT IS IN THE BEST INTEREST OF DHB AND WARRANTS APPROVAL BY THIS COURT

24.    Despite Derivative Counsel's belief that the claims asserted in the Derivative Action have merit, we also believe that an advantageous settlement for DHB now outweighs the

---

[4] The shareholder objections to the Settlement are attached hereto as Exhibits A-C.

risks of continued litigation. The corporate governance therapeutics will help prevent any future misconduct. Further, the principal actors allegedly behind the misconduct have been or will be removed from their positions with the Company. These changes will be a continued lasting benefit for DHB. *See* Declaration of Robert A.G. Monks ¶¶3-8, attached hereto as Exhibit D.

25.    Derivative Plaintiff faced significant risks given the complex factual and legal issues in the case. There was considerable uncertainty as to whether Derivative Plaintiff would be able to maintain the Derivative Action against all of the Defendants in the face of the demand futility attack mounted by Defendants in their Motion to Dismiss. Defendants vigorously argued that Derivative Plaintiff had to make a demand upon the Board.

26.    Even if the Derivative Action would have survived this initial motion, to establish liability, Derivative Plaintiff would still have to overcome the business judgment rule and its presumption that Defendants acted in good faith. Further, DHB might have chosen to create a special litigation committee ("SLC"). A SLC may assess the validity of a derivative action and make a recommendation whether or not to dismiss it. The SLC's recommendation is protected by the same powerful business judgment rule as a Board decision. Under Delaware law, Derivative Plaintiff would be required to demonstrate that the SLC, should it choose to dismiss the Derivative Action, was not independent and did not investigate the Derivative Action reasonably or with good faith. Additionally, Defendants would likely argue that indemnification agreements entered into with the Company prevented them from being held liable for their actions.

27.    In addition to these forceful defenses and procedural hurdles, just completing discovery and preparing the case for trial would have required substantial additional expenses and time to be expended by Derivative Counsel. Although Derivative Plaintiff believes that he has strong claims against Defendants, Defendants are formidable and well-financed and assisted by experienced counsel with national reputations for aggressiveness and excellent legal skills.

28.    The damages would be difficult to calculate and collect in this action and would inevitably be the subject of conflicting and complicated expert testimony. The amount of

damages would be sharply disputed and it is impossible to predict which arguments on damages would find favor with the trier of fact.   Also, it is likely that Defendants would claim that there actions were indemnified by DHB.  Such indemnification could prevent collection of a monetary benefit for DHB.  Moreover, even if the Court or jury accepted Derivative Plaintiff's version of facts, Defendants would surely appeal, thereby extending this Derivative Action and adding additional risk to a no recovery result. Further, DHB was in a precarious position financially. There was a legitimate concern that DHB would declare bankruptcy over the course of the litigation.  Any delay in recovery would further exasperate DHB's financial condition.

29.    The expertise of Derivative Counsel is another important factor in assessing the adequacy of a settlement.  As shown in the firm biographies, attached hereto as Exhibits E and F, Derivative Counsel consists of experienced and skilled practitioners in the field of shareholder derivative litigation and corporate law.  Derivative Counsel is also responsible for significant settlements as well as legal decisions that enable litigation such as this to be successfully prosecuted.

30.    The Stipulation also states that Derivative Counsel will be compensated $300,000 for the substantial benefit provided to DHB and reimbursement of expenses, subject to court approval (the "Fee and Expense Provision").  The Fee and Expense Provision is also reasonable and warrants approval.  Derivative Counsel prosecuted this action on a wholly contingent fee basis, making any recovery uncertain.   The contingent nature of the fee is appropriate in situations like this because an individual rarely has the financial resources to pay customary fixed rate hours.  In the course of this prosecution, Derivative Counsel devoted considerable financial resources and time to this case.  In total, Derivative Counsel expended over 1,400 hours prosecuting and settling this complex Derivative Action.  Derivative Counsel's total lodestar in this case, including paralegal and professional staff time is $539,237.75, nearly double the amount agreed to in the Fee and Expense Provision.  Furthermore, Derivative Counsel incurred significant expenses totaling $27,435.11 prosecuting and settling the Derivative Action.[5]

---

[5]  Derivative Counsel is willing to submit a detailed breakdown of all time and expenses if requested by the Court.

31.     For more than two years, Derivative Counsel pursued this action with as much vigor and skill as possible in the face of great risks.  Over these two years, as described above, Derivative Counsel took on substantial costs and financial burdens in order to advance this action.

32.     Throughout the litigation, Derivative Counsel engaged in a continuing investigation of the allegations in the Action and the alleged injuries suffered by the Company. Specifically, Plaintiffs: (i) investigated the facts of the suspiciously timed stock trades by Company insiders; (ii) analyzed the various types of claims available against Defendants; (iii) reviewed SEC filings, press releases and other publicly available news information regarding each of the persons and entities involved; (iv) researched applicable provisions of Federal and Delaware law; (v) negotiated the Settlement and prepared and revised the Stipulation; (vi) analyzed and responded to arguments raised by objectors to the settlement; and (vi) responded to shareholders of the Company that required further explanation of the Settlement.

33.     In light of this effort and the substantial benefit conferred upon DHB through the significant corporate governance measures adopted and/or maintained by DHB, the Fee and Expense Provision of the Settlement requesting $300,000 for attorney compensation and reimbursement of expenses and costs is incredibly reasonable and should be approved.

34.     The Fee and Expense Provision amount represents only a .5 lodestar multiplier. The lodestar multiplier is calculated by multiplying the number of hours expended by the hourly rate.  A court, at its discretion, may increase the lodestar by applying a multiplier based on factors such as the riskiness of the litigation and the quality of the attorneys.  Here, Derivative Counsel is not requesting any such increase.

35.     As explained in more detail above, derivative actions are extremely risky. There are numerous and difficult obstacles to overcome that prevent establishing liability.  Further, Derivative Counsel are experienced and extremely competent attorneys in the field of complex shareholder litigation. *See* Biographies of Robbins Umeda & Fink, LLP attached as Exhibit F. Derivative Counsel has litigation scores of shareholder derivative actions and they have a well-

known national reputation for pursuing their cases to a successful resolution. Given the risky nature of derivative actions in general, of this one in particular and the experience of Derivative Counsel, the multiplier sought is extremely reasonable and incredibly fair to DHB.

36.     For the reasons discussed above, it is the considered and informed judgment of Derivative Counsel, based on all the proceedings to date and their extensive experience in litigating complex derivative actions, that the Settlement: (i) provides substantial to DHB and its shareholders; (ii) allows DHB to put the Derivative Action behind; (iii) outweighs any potential benefits of the continued prosecution of the Derivative Action; and (iv) is fair, reasonable, adequate and in the best interests of DHB and its shareholders and should be approved by the Court.

## V.    CONCLUSION

37.     The proposed Settlement has been achieved as the result of hard fought litigation over 2 years and waged by skilled lawyers for both sides. The terms of the Settlement were arrived at through arduous arm's-length negotiations between the parties. Consequently, Derivative Counsel believe the Settlement is fair, reasonable, adequate and in the best interests of DHB and its shareholders and should be approved by the Court.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct. Executed this 28th day of September, 2007, at San Diego, California.

DATED: September 28, 2007               ROBBINS UMEDA & FINK, LLP
                                        BRIAN J. ROBBINS
                                        JEFFREY P. FINK


                                            /s/ Brian J. Robbins
                                        _____
                                        BRIAN J. ROBBINS (BR4747)

                                        610 West Ash Street, Suite 1800
                                        San Diego, CA 92101
                                        Telephone: (619) 525-3990
                                        Facsimile: (619) 525-3991

283488_5.DOC
                                    - 10 -

# Exhibit A

Graham Hunt
318 Desplaine Rd.
De Pere, WI 54115

September 18, 2007

Clerk of the Court
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Alfonse M. D'Amato Federal Building
100 Federal Plaza
Central Islip, NY 11722-4438

In re: DHB INDUSTRIES, INC. DERIVATIVE LITIGATION

To Whom It May Concern:

As a DHB shareholder since October 8, 2003, I write to object to the proposed settlement of derivative action. My proof of ownership of DHB common stock as of November 30, 2006 is enclosed.

It is easy to do what is expedient and difficult to do what is just. I would urge the court to take the harder path in this case and to do what is just, namely to reject the current settlement. I believe the settlement to be unfair to DHB shareholders for at least three reasons:

(1) I object that the settlement prohibits DHB from taking any further legal action against the defendants.

Please allow me to explain how my wife and I have been personally hurt by the actions of the defendants. We are not wealthy people. We do not own a home. We have nothing saved for our children's college education. We have less than $30,000 in combined retirement savings as of today's date.

We believed in the company so much that, in hindsight, we over-weighted DHB in our IRA portfolios. Thus, we have fully borne the consequences of this company's recent accounting scandals.

One final impact regards our ability to purchase a home. As the stock hovered around its high in December of 2004, we began to talk about withdrawing some of the money from my IRA to take advantage of the IRS's penalty-free withdrawal of IRA funds for the purchase of a first-time home. As the price fell through 2005, this opportunity seemed

less and less feasible. With the recent accounting scandals, and the further drop in price, this option now seems impossible.

I mention this to remind the court that the actions of the defendants hurt real, middle-class people. We believe that DHB Industries should have every right to seek restitution in a way that maximizes shareholder value. The settlement does not maximize shareholder value; it dilutes it.

Objection #2: I object that the settlement indemnifies certain defendants against any liability under Section 304 of the Sarbanes-Oxley Act of 2002.

The great personal irony of my role as a DHB shareholder is that, simultaneously at my own place of employment, I was working very hard on some Sarbanes-Oxley related projects. Thus, at the same time I was putting in many extra hours to protect the investors of the company for which I worked, no level of government in my opinion was stepping in to protect me from shareholder abuse and material misrepresentation at DHB. In short, I received all the pain of Sarbanes-Oxley and none of the benefits. To indemnify the defendants from this section of Sarbanes-Oxley would be grossly unfair to all those shareholders, like myself, who have worked to improve accounting standards and corporate governance in American companies. Please allow Sarbanes-Oxley to fulfill its role.

Objection #3: I object that the settlement permits defendants to resume roles within DHB after 5 years. Also, I object that, through the settlement, David Brooks has received 6,007,099 new shares of stock.

I believe that I am not alone among shareholders in thinking that DHB's growth and potential is hindered by its association with David Brooks. In order for the company to prosper and for its share price to appreciate, it must sever ties to Mr. Brooks. Increasing Mr. Brooks' overall percentage of total common stock and allowing for even the possibility of some resumed role within five years places a cloud over the future independence and integrity of this company. I believe his exchange of $22,325,000 for 6,007,099 shares should be reversed. I also believe that the defendants should be permanently barred from future involvement with DHB.

Thank you very much for reading and considering my objections to the settlement. I would ask the court not to forget the many small shareholders of DHB who have been significantly impacted by the actions of the defendants, seek a just restitution from those responsible, and look forward to a revitalized company beholden to shareholders that can stand with full integrity. Please reject this settlement as it works against these goals.

Sincerely,

*Graham Hunt*

Graham Hunt

Graham Hunt, Page 2



**USAA®**

Brokerage Account
January 1 to December 31, 2006
Page 3 of 5

# Brokerage Account

## Commission level

Current commission level is:                 Gold
You have executed 0 trades
Please visit usaa.com to see the current commission
schedule.

USAA FED SVGS BNK C/F SDIRA
GRAHAM C HUNT

# Brokerage summary

## Gain/(loss)

|                        | This period      | Year to date   |
| ---------------------- | ---------------- | -------------- |
| Unrealized gain/(loss) | $(1,754.90) LT   | Not applicable |

The gain/ (loss) on your current portfolio is only
informational and should not be used for tax reporting.
LT-long term:  assets held for more than 1 year.
ST-short term:  assets held for 1 year or less.

# Balances and Holdings

For your detailed cost basis information on realized and unrealized gains (losses) see page 05 .
C - Cash account, S - Short account, M - Margin account, MM - Money market account, O - Other accounts.

 *   Please go to usaa.com to see the current dividend data.

## Cash equivalents

|                    | Current rate | 7-day yield | Balance    |
| ------------------ | ------------ | ----------- | ---------- |
| USAA MONEY MARKET  | -            | 4.850%      | $8,201.00  |

## Equities/other exchange traded holdings

Small cap stocks/funds

| Symbol/Description    | Acct Type | Quantity  | Price   | Est.annual income* | Market value |
| --------------------- | --------- | --------- | ------- | ------------------ | ------------ |
| DHBT                  | C         | 1,500.000 | $2.9500 | -                  | $4,425.00    |
| DHB INDUSTRIES INC    |           |           |         | -                  |              |

# Activity

## Earnings

# Exhibit B

William F. Sondericker (WS7480)
Gary D. Sesser (GS7706)
Laura Anne Reeds (LR9681)
CARTER LEDYARD & MILBURN LLP
Two Wall Street
New York, New York 10005
(212) 732-3200

D. David Cohen, Esq. (DC2051)
LAW OFFICES OF D. DAVID COHEN
500 North Boradway Suite 133
Jericho, New York 11753
(516) 621-5813

Attorneys for D. David Cohen, Esq.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

| | | |
|---|---|---|
| In re DHB INDUSTRIES, INC. CLASS ACTION LITIGATION | : : : | 2:05-cv-04296-JS-ETB<br>CLASS ACTION |
| In re DHB INDUSTRIES, INC. DERIVATIVE LITIGATION | : : : : | 2:05-cv-04345-JS-ETB<br>DERIVATIVE ACTION |
| This document relates to:<br>ALL ACTIONS | : : : : | |

---------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## OBJECTION TO DERIVATIVE SETTLEMENT

D. David Cohen, a member of the proposed class and current shareholder of DHB

Industries, Inc., submits this Memorandum of Law in support of the Objections to the Derivative

Settlement pursuant to Rules 23(e)(4)(A) and 23.1 of the Federal Rules of Civil Procedure. See

Fed. R. Civ. Pro. 23(e)(4)(A), 23.1; see also § 21.1.11 (discussing shareholder objections to

settlement of derivative actions).

I.    THE DERIVATIVE AND CLASS ACTION SETTLEMENTS SHOULD NOT BE
      APPROVED BECAUSE THEY ARE NOT FAIR, REASONABLE OR ADEQUATE

Before a court may approve the settlement of a class action, it must hold a hearing to

determine whether that settlement is "fair, reasonable and adequate."    Fed. R. Civ. Pro.

23(e)(1)(C). This requirement is applicable to derivative settlements as well. See Weinberger v.

Kendrick, 698 F.2d 61, 73 (2d Cir. 2001); In re AOL Time Warner Shareholder Derivative Litig.,

No. 02 Civ. 6302, 2006 WL 2572114, at *2 (S.D.N.Y. Sept. 6, 2006); In re Met. Life Derivative

Litig., 935 F.Supp. 286, 291 (S.D.N.Y.). Moreover, where the settlement of a derivative action is

concerned, there must be a finding that the settlement "fairly and adequately serves the interests

of the corporation on whose behalf the derivative action was instituted." AOL Time Warner,

2006 WL 2572114, at *2; Mathes v. Roberts, 85 F.R.D. 710, 713 (S.D.N.Y. 1980); Lewis v.

Anderson, 81 F.R.D. 436, 438 (S.D.N.Y. 1978).

The court must assess the fairness, reasonableness and adequacy of "the negotiating

process leading up to settlement as well as the settlement's substantive terms." D'Amato v.

Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001); AOL Time Warner, 2006 WL 2572114, at *2.

With respect to procedural fairness, reasonableness and adequacy, if the court cannot assure itself

that the settlement was the product of "arms-length negotiations" or cannot ascertain that the

plaintiff's counsel "have engaged in the discovery[] necessary to effective representation of the

class's interests," the proposed settlement should not be approved. D'Amato, 236 F.3d at 85;

Weinberger, 698 F.2d at 73; AOL Time Warner, 2006 WL 2572114, at *3. As discussed below,

the proposed Settlement is not procedurally fair, reasonable or adequate.

2

In evaluating the substantive fairness, reasonableness and adequacy of a proposed class action settlement, the court may evaluate a variety of factors, including those set forth by the Supreme Court in Detroit v. Grinnell Corporation:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974). Courts may modify the Grinnell factors when evaluating the substantive fairness, reasonableness and adequacy of a proposed derivative settlement. See, e.g., AOL Time Warner, 2006 WL 2572114, at *3 (evaluating "(1) the reasonableness of the benefits achieved by the settlement in light of the potential recovery at trial; (2) the likelihood of success in light of the risks posed by continued litigation; (3) the likely duration and cost of continued litigation; and (4) any shareholder objections to the proposed settlement") (citing Grinnell); Met. Life, 935 F.Supp. at 292 (evaluating "(a) the benefits achieved by the Proposed Settlement; (b) the likelihood of success if the case were to be litigated; (c) the potential recovery; (d) the likely duration and cost of continued litigation; (e) the quality of the negotiating process and the views of counsel; and (f) the objections") (citing Grinnell). Regardless of the other factors that the court deems pertinent, its principal concern must be "the strength of the case for plaintiffs on the merits balanced against the amount offered in settlement." Grinnell, 495 F.2d at 455; AOL Time Warner, 2006 WL 2572114, at *3; Saylor v. Bastedo, 100 F.R.D. 44, 49 (S.D.N.Y. 1983); Mathes, 85 F.R.D. at 714; Lewis, 81 F.R.D. at 439. As discussed below, the proposed Settlement fails miserably on this account.

3

It is clear that the proposed Settlement of the class and derivative actions is not fair, reasonable or adequate, in either a procedural or substantive sense. The substantive elements of the proposed Settlement are especially egregious. The inadequacy of the investigation performed by the proponents of the Settlement makes it difficult to balance "the strength of the case for plaintiffs on the merits [] against the amount offered in settlement." Grinnell, 495 F.2d at 455. Since the full extent of the wrongdoing by the Individual Defendants is still unknown, it is impossible to know what "the best possible recovery" might be. Id. at 463. Although the members of the proposed class[1] will indeed receive a monetary recovery, that recovery might well be inadequate when compared against the full amount that could likely be recovered from the Individual Defendants if the full extent of their wrongdoing were exposed. See Saylor, 100 F.R.D. at 57 (rejecting $250,000 settlement where court determined that recovery could be as high as $800,000). While its proponents claim that the Settlement would recover between thirty and forty percent of "estimated" damages, they have provided no basis for this estimate. And, although the proponents claim that DHB cannot afford a larger settlement, this would clearly not be the case if the Individual Defendants were being required to disgorge the money that they wrongfully acquired from the Company.

It is obvious that the proposed Settlement fails to serve the interests of the public company and instead serves the interests of the Individual Defendants. Under the proposed

---

[1] The proposed class is almost certainly erroneous. The initial class period began on March 24, 2004 and ended on August 29, 2005. The Settlement would change the start date to November 18, 2003. Both of these proposed start dates fail to acknowledge that the Individual Defendants began falsifying the Company's financial statements at least as early as the first quarter of 2003, and have continued to falsify each statement thereafter. It also appears that the proposed end date is erroneous. The original class period was to have ended on August 29, 2005, the day before DHB announced a massive $60,000,000 write-off relating to its Zylon product line. The proposed Settlement would change the end date to November 30, 2006. Both dates are likely erroneous. The August 30, 2005 announcement was just one of the many false and misleading acts, many of which likely occurred between August 30, 2005 and November 30, 2006, or after. Until an appropriate class period is established, there is no way to estimate what the actual scope of the recovery might be.

4

Settlement, DHB releases the Individual Defendants from all liability for their illegal actions and pays for the entire class action award, yet recoups none of the money stolen from it by those Defendants. Instead, Brooks will be permitted to exercise 5,250,000 stock options at a highly attractive price, and to acquire additional shares of the Company outright, giving him greater control over the Company. Although the proponents of Settlement tout the new "Governance Principles and Policies," those policies are largely a rehash of standard by-laws and are free to be amended by DHB at any time. The derivative Settlement permits DHB to continue to be a model of bad corporate governance, including control by Brooks, no stockholder election of directors, refusal to provide Board representation or input to the Company's largest public shareholders, no compliance with financial reporting obligations, very selective financial reporting, and grants of thousands of free Shares to principals of DHB who "went along" with the Settlement. At the end of the day, the Individual Defendants are the only ones who benefit from the Settlement, and the public company continues to be harmed as a result.

The proposed Settlement likewise fails in terms of procedure. The proponents of the Settlement have not produced any evidence that the Settlement was the product of serious, non-collusive, arms-length negotiation, and there are strong indications to the contrary: the MOU was arrived at while the Individual Defendants still controlled DHB, and there was no independent representation for Company; the Settlement allows the Individual Defendants to completely escape liability for their crimes without paying back a penny of the money they stole; DHB recoups none of the losses it suffered at the hands of the Individual Defendants; and DHB is forced to pay the entire class action award, partially from proceeds received through the sale of shares to Brooks at suspiciously favorable prices, a transaction that not only benefits Brooks monetarily but allows him to strengthen his control over the Company. While its proponents

5

continue to claim that this shocking outcome was arrived at through arms-length negotiation, no evidence as to the nature of these negotiations has been produced. There has been no attempt to describe which individuals participated in the negotiations, when and where these negotiations took place, what issues were discussed, or what documents were exchanged.

Nor have the proponents of Settlement produced evidence to show that they engaged in the discovery necessary to adequately represent the interests of the class or of DHB. While its proponents continue to claim that the Settlement was arrived at after extensive investigation, no evidence of such an undertaking has been produced. It appears that little or no document discovery has been conducted[2] and no attempt was made to take a single deposition from any of the Individual Defendants or other witnesses.[3] Nor does it appear that the Company's books and records were ever reviewed in a meaningful way. The Company did not file an audited financial statement for 2006 or any financial statement whatsoever for 2006, and there has been no attempt to procure the results of the accounting performed by Alix Partners or obtain a review by any

---

[2] No documentary evidence concerning any of the matters at issue in the underlying dispute or the Settlement was subpoenaed by Class Counsel and there is no record of any voluntary production of documentary evidence of any kind by the Individual Defendants or the Company prior to the Settlement.

[3] The proponents of Settlement have yet to explain how taking the following depositions was unnecessary to the adequate representation of the class:

     (a)     Defendant David H. Brooks (CEO), alleged to have been the primary wrongdoer;

     (b)     Defendant Dawn Schlegel (CFO), who was indicted on August 17, 2007;

     (c)     Defendant Sandra Hatfield (COO), who was also indicted on August 17, 2007;

     (d)     Defendants Jerome Krantz, Gary Nadelman, Cary Chasin or Barry Berkman, the so-called "outside" directors of DHB, who (together with Brooks) engaged in simultaneous warrant exercises and share sales (collecting in total over $200,000,000) between November 29, 2004 and December 30, 2004, on false financial information and other nondisclosures and misinformation;

     (e)     The two prominent accounting firms, each of whom resigned from their employment with DHB during the periods in question;

     (f)     The underwriting, brokerage and other firms which handled the sale of 10,000,000 DHB Common Shares by the Individual Defendants from November 29, 2004 to December 30, 2004;

     (g)     Defendant Terry Brooks, the wife of Defendant David Brooks, who owned TAP, one of the Company's principal suppliers during the Class period, and received millions of dollars from the public Company's coffers during that period;

     (h)     Present and/or former employee of the Company, its subsidiaries, TAP and other Brooks-related persons and entities which did business with the Company during the Class period.

other independent accountant. It is clear that whatever investigation was conducted by the proponents of Settlement was wholly inadequate.

## II.   THE DISTRICT COURT MINIMALLY SHOULD REQUIRE A FULL TESTIMONIAL HEARING BEFORE APPROVING ANY SETTLEMENT

A testimonial hearing taken in an appropriate adversarial proceeding with a full and fair opportunity for the objecting parties to call and examine witnesses would demonstrate beyond a doubt that the Settlement does not serve the interests of DHB or its public shareholders and is not a fair, reasonable and adequate settlement. There are so many unanswered questions about so many different issues—such as the conduct of the negotiations leading up to the Settlement, the investigations undertaken to determine the extent of the wrongdoing by the Individual Defendants, and the propriety of the currently proposed class periods—that approval of the Settlement at this time would plainly be premature. See Chateau de Ville Productions, Inc. v. Tams-Witmark Music Library, Inc., 586 F.2d 962, 966 (2d Cir. 1978) (overturning class certification where district judge decided certification motion without sufficient development of the facts).

There is a responsible alternative to premature approval of the Settlement. If the Court is disinclined to deny approval of the Settlement outright, it should set dates for full evidentiary hearings after allowing the objecting parties to conduct discovery on contested issues relevant to the fairness, reasonableness and adequacy of the Settlement. See Heerwagen v. Clear Channel Commc'n, 435 F.3d 219, 233–34 ("Discovery on the prerequisites of Rule 23 is plainly appropriate, and in some cases necessary." (internal citation omitted)); Chateau de Ville Productions, 586 F.2d at 966 ("The court should defer decision on certification pending

discovery if the existing record is inadequate for resolving the relevant issues."). <u>Accord</u> Letter from KGS to the Court, September 9, 2007.

III.    CONCLUSION

For the foregoing reasons, the court should reject the proposed class action and derivative Settlements as unfair, unreasonable and inadequate.  At the very least, the court should permit discovery and hold full evidentiary hearings to resolve the many unanswered questions surrounding the proposed Settlement.

Dated:  September 20, 2007

New York, New York

D. David Cohen
by his Counsel:
Carter Ledyard & Milburn LLP
By:

_____
2 Wall Street
New York, NY 10005
(212) 238-8820
(212) 732-3232
William F. Sondericker, Esq.
Gary D. Sesser, Esq.
Laura Anne Reeds, Esq.

_____
D. David Cohen, Esq.
<u>Pro se</u>
500 North Broadway
Suite 133
Jericho, NY 11753
(516) 933-1700
(516) 033-8454

8

# Exhibit C

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: DHB INDUSTRIES, INC. | ) | Civil Action No. |
| CLASS ACTION LITIGATION | ) | 2:05-CV-04296-JS-ETB |
| | ) | Class Action |
| | ) | |
| ————————————— | ) | |
| | ) | |
| IN RE DHB INDUSTRIES, INC. | ) | Civil Action No. |
| DERIVATIVE LITIGATION | ) | 2:05-CV-04345-JS-ETB |
| | ) | Derivative Action |
| | ) | |
| ————————————— | ) | |
| | ) | |
| This Document Relates To: | ) | |
| ALL ACTIONS | ) | |
| | ) | |
| ————————————— | ) | |

## OBJECTIONS TO PROPOSED SETTLEMENT

## PRELIMINARY STATEMENT

On July 3, 2007, this Court issued an order granting preliminary approval

of the settlement (the "Settlement") of the referenced class and derivative actions

concerning fraud and misconduct at DHB Industries, Inc. ("DHB") (collectively, the

"Action"). Thereafter, on August 3, 2007, after a telephonic conference with the Court,

a revised notice of the Settlement was submitted (the "Revised Notice"). This

memorandum is submitted in opposition to the Settlement of the Action on behalf of a

committee of DHB shareholders, certain of whose members have submitted in the

aggregate six objections to the fairness of the proposed Settlement. They are: Graham Hunt, Susan O'Donnell, Michael Shapiro, Chaim and Victoria Jedwale, Daryl Lowenstein, Neale Monte, and Ron Henson (the "Committee Objectors"). They are large and small shareholders of DHB Industries, Inc. ("DHB") who believe the Settlement is unfair for three separate reasons: the Settlement amount is inadequate; the Notice and Revised Notice are incomplete; and the process by which the Settlement was reached was flawed. Indeed the process is so flawed that the Second Circuit has added to the substantive motion calendar two separate appeals from this Court's preliminary approval of the Settlement of the class action (Appeals docketed, Nos. 07-3065 and 07-3117 (2d Cir. July 18, 2007).

The Committee Objectors expect an extraordinary number of objections to this Settlement by other DHB shareholders, both large and small, who will seek to convince the Court of its unfairness. Each will submit papers; each will seek to speak at the fairness hearing.[1] Committee Objectors may also seek to be heard at the Settlement hearing because they are angry and feel betrayed by the system that has permitted this obviously inadequate Settlement to have reached this stage. Arguments against its fairness are legion, and this memorandum will refer to, but not deal with

---

[1] The Committee Objectors incorporate by reference the arguments made by Lena Bedik in her memorandum objecting to the Settlement.

2

each in detail, because of the numerous prior objections and communications with the Court concerning the Settlement's unfairness. This memorandum is intended to describe why the Committee Objectors' rights would be trampled were this Settlement approved.

## ARGUMENT

### A.     THE CONSIDERATION IS INADEQUATE AND ILLUSORY

> 1.     The Settlement Is Funded In Part By
> Selling DHB Stock At A Bargain Price.

A significant portion of the Settlement is being funded by selling additional corporate control to David H. Brooks ("Brooks"), former Chief Executive Officer of DHB, and the alleged architect of the alleged fraud, at an inadequate price. On the date of the Revised Notice, DHB stock was selling at $5.15 per share. Yet to fund the Settlement in part, DHB permitted Brooks to exercise a warrant to purchase 3,000,000 DHB shares at $2.50 per share and sold him 3,007,099 additional DHB shares at $4.93 per share, less than their August 3rd price. Thus, approximately $22 million of the approximately $35 million cash component of the Settlement is based on selling Brooks over 6,000,000 shares of DHB stock at a bargain price, thereby increasing his ownership of DHB's stock to 28%.

Increasing Brooks' ownership is in sharp contrast to the picture painted for this Court at the January 19, 2007 hearing. There, counsel for DHB touted to the Court Brooks' separation from DHB as follows:

> THE COURT: He [Brooks] is on administrative leave now. Am [sic] correct?
>
> MR. RIDER: No. He was placed on administrative leave by the board before the MOU was entered into. Thereafter, he resigned as part of this agreement.
>
> So he is no longer an officer nor director of this Company. He is a shareholder but he is no longer an officer or director of this Company.

Jan. 19, 2007 Tr. at 61, l. 6-14.

> 2.    The Parties Reached A Settlement, Then Expanded The Class For No Additional Consideration.

The first DHB securities class and derivative actions were action were filed in September 2005. On January 31, 2006, the class and derivative actions that had been filed were consolidated, and Co-Lead Plaintiffs were appointed. On March 20, 2006, Lead Plaintiffs filed their amended class action complaint alleging securities fraud claims against Defendants on behalf of all purchasers of DHB securities between March 24, 2004 and August 29, 2005 (the "Initial Class Period") and against certain of its officers and directors on behalf of DHB. DHB's outside auditors were not named as defendants. Thereafter, Defendants filed motions to dismiss the Action. Lead

4

Plaintiffs never responded to those motions. No discovery was conducted in the Action.

On August 17, 2006, DHB effectively withdrew its interim and annual financial statements for the years ended December 31, 2003 and December 31, 2004, noting those financial statements could not be relied upon. The Initial Class Period alleged in Lead Plaintiff's class action complaint excludes a substantial portion of that period.

On December 15, 2006, the parties filed the stipulation of settlement (the "Stipulation") including both the class and derivative actions. The class period was extended in the Stipulation to include all purchasers of DHB securities between November 18, 2003 (over five months before the starting point of the Initial Class Period) and November 30, 2006 (over 15 months after the closing date of the Initial Class Period) (the "New Class Period"). The New Class Period swept in much of the time-period covered by the August 17 withdrawal announcement. Yet, the parties entered into the Memorandum of Understanding upon which the Settlement was reached prior to that announcement. Nevertheless, the Stipulation also provided for the release of all Class members' claims for the enlarged class period against DHB's auditors for the entire New Class Period, even though the accountants had never been named in the Action, no consideration was being paid by the accountants, and no

5

defendant paid any additional consideration. Thus, the Settlement provides no additional compensation to shareholders from DHB's auditors, or any additional compensation for the newly revealed claims in the earlier period.

In addition, the settlement of the companion derivative action provided that all current DHB shareholders, also putative class members who still hold DHB stock, are being forced to release their individual direct federal securities claims for no consideration, regardless of whether they opt out of the proposed class action settlement, and with no right to exclude themselves from the derivative release.

**B.    THE NOTICE AND REVISED NOTICE ARE INADEQUATE**

It is impossible for the class members to make an informed judgment on the fairness of the Settlement because the Notice and Revised Notice fail to address numerous material matters necessary to determine whether to object or opt out.

The recent decision in In re Veritas Software Corp. Sec. Litig., _ F.3d _, 2007 U.S. Dist. LEXIS 17623 at *16-17 (9th Cir. July 25, 2007), highlights the basic purpose of class notice, holding "[i]t is the clear purpose of the notice requirement to allow class members to evaluate a proposed settlement" to determine whether to opt out or object. Because the parties advocating the settlement are permitted to go last (as opposed to the standard rule that a movant provide his or her support for the requested relief sought), because there has been a Revised Notice without an extension of time to

object or opt out, with absent class members having to submit papers in opposition <u>before</u> the moving parties have filed meaningful and informative papers and evidence in support of the relief they seek to impose, class members cannot decide meaningfully whether to object or opt out..

Those material omissions from the Notice and Revised Notice include:

1.    Failure to disclose that the Court has certified a Class pursuant to the agreement of the parties (as distinguished from the normal litigation process) or to inform class members that they have the right to challenge its certification and/or definition;

2.    Failure to disclose any damage analysis, which is necessary to determine whether to object or opt out;

3.    Failure to identify the class representatives or the dates they purchased DHB shares, if they did, and whether they sustained losses;

4.    Failure to provide any discussion of the factual basis or substance of any of the claims, issues, or defenses, or how those claims vary among the various subclasses;

5.    Failure to provide any discussion of potential or actual conflicts that may exist with respect to the claims of different subclasses;

7

6.      Failure to specify why DHB's accountants are being released for no consideration, and why;

7.      Failure to discuss the settlement negotiations, including the fact that Lead Plaintiffs' counsel agreed to an open-ended date for the Class and extended the beginning date of the class period back several months after fixing the Settlement amount, thereby sweeping numerous persons into the class not represented by lead plaintiffs under the operative complaint, or the reasons why;

8.      Failure to disclose that no claims have been asserted in any pleading for the putative subclasses;

9.      Failure to disclose the interaction between the class and derivative releases, including the fact that current DHB shareholders can have their direct individual securities fraud claims released whether or not the class action settlement is approved and for no consideration; and

10.     Failure to disclose that the class settlement amount was agreed upon before the parties agreed on the parameters of the class and, therefore, before the allocation of the proceeds of the settlement was determined, while simultaneously diluting the benefits to the members of initial class.

8

## C.    THE SETTLEMENT PROCESS WAS FLAWED

Based on the Notice and Revised Notice, it is impossible to determine what, if any, investigation Lead Counsel engaged in to arrive at the Settlement, or what damage analysis led to the consideration therein. Lead Counsel appear not to have taken any discovery. And while significant events occurred after the parties entered into the Memorandum of Understanding, there appears to have been no investigation of those events nor an increase in the Settlement consideration based on those events. Lead Counsel appear to have been unfazed by the withdrawal of DHB's financials for 2003 and 2004 and similarly uninterested in the fact that two defendants in this action, Dawn Schlegel, DHB's former Chief Financial Officer, and Sandra Hatfield, former President of DHB's principal subsidiary, were indicted for crimes allegedly committed while acting in those capacities.

While seemingly unmotivated to obtain the greatest possible recovery for the class they purport to represent, Lead Counsel seek to achieve significant benefit for each subclass lead plaintiff they purportedly represent, namely $25,000 each for acting as a class representative. See Revised Notice of Pendency and Settlement, Document 271-2, at p. 3. Who are these plaintiffs? They are not named in the Notice. (Indeed the Notice names the derivative plaintiff – Alvin Viray – but conspicuously fails to name class plaintiffs.) Are there eight of them? There should be, because there are

9

eight subclasses. In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 204

(S.D.N.Y. 2003) ("[l]ead plaintiffs have a responsibility to identify and include named

plaintiffs who have standing to represent the various potential subclasses of plaintiff").

Is class counsel asking for a total of $200,000 for these unnamed plaintiffs, who

should be, but are not, named?  If so – what did they do to deserve $25,000 each?

Lead Counsel never deposed any defendants in this Action; surely there were no

depositions of plaintiffs - at least the Notice and Revised Notice fail to reveal their

occurrence.  What the named plaintiffs may have done to earn $25,000 each is

certainly not illuminated by the communications with absent class members.

## CONCLUSION

For the reasons stated herein, the Committee Objectors respectfully

request the Court not approve the Settlement of the Action.

Dated:  September 21, 2007

HARWOOD FEFFER LLP

By:    _Samuel K. Rosen_

Robert I. Harwood (RH-3286)
Samuel K. Rosen (SR – 3287)
488 Madison Avenue
New York, New York 10022
Telephone: (212)935-7400
Facsimile: (212) 753-3630

*Attorneys for Committee Objectors*

10

# Exhibit D

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re DHB INDUSTRIES, INC. CLASS ACTION LITIGATION | Civil Action No. CV 05-4296 (JS)(ETB)<br>CLASS ACTION |
| In re DHB INDUSTRIES, INC. DERIVATIVE LITIGATION | Civil Action No. CV 05-4345 (JS)(ETB)<br>DERIVATIVE ACTION |

### DECLARATION OF ROBERT A.G. MONKS

I, ROBERT A.G. MONKS, declare as follows:

1.      I am the founder of Lens Governance Advisors, LLC ("LGA"), an organization that specializes in the field of improving corporate governance.

2.      Since 2002, LGA has advised the country's leading plaintiffs' securities law firms and their clients on corporate governance remedies for more than fifty of the largest alleged securities frauds in recent years, yielding landmark settlement provisions for governance reforms. A more detailed description of the work of my firms is attached hereto as Exhibit A, and my curriculum vitae is attached as Exhibit B.

3.      As discussed in greater detail below, I believe that the governance remedies agreed to in connection with the DHB Industries, Inc. ("DHB") settlement are at the forefront of good corporate governance, are beneficial to the company and its shareholders, and would not have been implemented but for the Plaintiffs' actions and the work of Plaintiffs' counsels.

1

4.    There are new standards of best practice in corporate governance and some companies have taken longer to adopt them than others. DHB, through the settlement, is coming into compliance with current standards of corporate governance best practices. The terms of the settlement create a structure for advancing the corporate governance of the company, and the company has already shown, through actions taken in recent months, that they will enliven the potential of these reforms by a real commitment – for example, the board's decisions to reconstitute itself and elect an independent chair.

5.    Corporate governance reforms have a substantial impact on the valuation and management of public companies and the best corporate governance. The leading international consulting firm *McKinsey & Company* began in 2000 to survey the largest – approximately 2,000 – institutional investors ($3.25 trillion of assets under management) with respect to the value they placed on good corporate governance.

6.    The actual premium respondents said they would be willing to pay for a well-governed company differs by country. The premium reported for the United States is 18.3%.

7.    The *McKinsey* report concludes: "Although it remains difficult to measure the impact on market prices of the premiums investors say they are willing to pay for well-governed companies, the amounts they are prepared to pay leave little doubt that good governance does feed through.... If companies could capture but a small portion of the governance premium that is apparently available, they would create significant shareholder value."

8.    Efforts to understand and codify "good governance" in the past several years have moved out of the realm of academia and not-for-profit associations and into the reality of the marketplace. As corporate leaders and market managers have

recognized the value of governance to performance, these efforts have assumed a sense of urgency and governance reforms have been more dramatic. These reforms recognize the reality described by the academics but, more importantly, confirmed by disastrous events in recent years, recognize that good corporate governance reduces risk and enhances performance.

9.    The DHB settlement agreement embodies the spirit of these best practices in the following important respects:

10.    **Adoption of Corporate Goverance Guildelines.** Before this settlement, the company had no published corporate governance guidelines at least readily available for shareholders or potential investors in the company to review. The terms of settlement expressly spell out new corporate governance guidelines in a public document. It is to be hoped that the company will post these guidelines for public view on its website. The availability of such guidelines gives shareholders comfort and reduces investment risk by clearly demonstrating the board's commitment to transparency and review of a system of governance. Furthermore, the guidelines themselves identify a more empowered board of directors. Increasing the accountability, focus and overall independence of directors will promote a board that is committed to playing an active informed role in the company.

11.    **Meetings of Independent Directors.** The settlement stipulates that "independent directors should meet routinely and regularly without management". Such meetings are an important opportunity for directors to voice their concerns that they may otherwise not. This is a critical part to effective board oversight and functionality. The last available proxy from the company does not mention any such meetings.

12.    **Director Over-Commitment.** The settlement further requires that "…no director shall serve on more than four (4) outside public boards of for-profit companies."

Studies by The Corporate Library, an independent governance research firm, strongly suggest that 'professional directors' who sit on more than four boards are rarely the most effective board members.

13.   **Directors' Attendance at Shareholder Meetings.**  The settlement provides that DHB's "directors are encouraged to attend the Company's Annual Meeting of Stockholders".  The shareholder meeting is the one time each year where all shareholders have access to the directors of their company and therefore it is imperative that the directors be present.  By implementing this reform, DHB shareholders will benefit from direct access to the members of the board of directors. The 2005 proxy stated that "No members of the Board of Directors attended the Company's 2004 annual stockholders meeting."

14.   **Other Governance Reforms Implemented During Pendency of Case.**  The company made other changes to its governance over the course of the lawsuits that merit mention, including the following:

     (a)   Changing the composition of the Board of Directors to replace those directors, including the founder, who had served during the period covered by the litigations; and

     (b)   Electing an independent Chairman of the Board.

15.   The cumulative impact of the governance changes agreed upon as an essential part of this settlement will be to increase the value of the ownership of DHB shares on a going-forward basis.  While precision is not appropriate with a settlement of this kind, we estimate that, after implementation of the settlement terms, the market value of DHB shares will be fortified with the governance improvements provided for in this settlement.

16.    It is, therefore, my conclusion that the governance provision of the settlement with DHB is a significant accomplishment in both scope and substance, and one that has and will increase the value of the company. It is also a remarkable achievement that is, I believe, the direct result of Plaintiffs' and their counsel's diligence and commitment to pursuing the litigation.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 28th day of September, 2007.

ROBERT A.G. MONKS

## EXHIBIT A

Lens Governance Advisors, LLC, is a firm founded by Robert A.G. Monks, its sole partner, in 2002. Mr. Monks created the firm to further his three decades of work in corporate governance and accountability and in improving shareholder value through increasing shareholder involvement. Corporate scandals coming to light in recent years have underscored the potential of shareholder litigation as a means of reforming and enforcing corporate governance practices. LGA's purpose is to realize that potential, while continuing the work of shareholder consulting and engagement performed successfully by Lens Investment Management, LLC, from 1992 to 2002.

Since 2002, LGA has advised the country's leading plaintiffs' securities law firms and these firms' clients on corporate governance remedies for more than 50 of the largest alleged securities frauds in recent years.

### Robert A.G. Monks

Mr. Monks is a graduate of Harvard College (magna cum laude, 1954), Cambridge University (1955), and Harvard Law School (1958; winner Ames moot court competition). He was a general partner in the Boston, Massachusetts, law firm of Goodwin Procter & Hoar. Subsequent to the full-time practice of law, he has had careers in business (CEO of C. H. Sprague & Son Company - coal and oil distribution), investments (principal of Gardner Associates and Chairman of the Board of the Boston Company and Boston Safe Deposit & Trust Company), and state government administration (Energy Commissioner for the State of Maine, Chairman of two commissions to oversee the administration of the Maine State Retirement System appointed by Governor McKernan). Mr. Monks also has served in federal government administration as founding Trustee of the Federal Employees' Retirement System and a Director of the United States Synthetic Fuels Corporation by appointment of President Reagan, and Administrator (office is now Assistant Secretary) of the Office of Pension and Welfare Benefits Administration (Department of Labor) in charge of overseeing the private pension system in the United States.

Subsequent to his federal government service in 1985, Mr. Monks has devoted his full time and energy to the creation of a system of effective corporate governance in the United States. In order to accomplish this, he has been active in several different, but importantly related, spheres. He has founded five businesses which provide needed governance services:

- Institutional Shareholder Services (1985) provides proxy and ownership services to institutional investors around the world. ISS has achieved the position that its recommendation is often the single deciding factor in contested proxy situations, such as the merger of Compaq and Hewlett Packard in 2002. ISS is today a major company dominating the proxy field worldwide. Monks sold his interest in 1994 to the Thompson Group. In 1999 the Thompson Group sold ISS via a private

auction, and it was bought by a consortium organized by Mr. Monks's son, Robert Monks, the younger, who was its chairman until the sale of ISS to RiskMetrics in January 2007.

- Subsequent to disposing of his interest in ISS, Mr. Monks organized Lens Investment Management (LIM), an activist investment manager with several private and public partners, which functioned as an "activist investor" and over the decade of the 1990s materially outperformed the principal stock market indices.

- Mr. Monks also organized (1999) Hermes Focus Asset Management Company in the United Kingdom which has successfully employed the same "activist investment" policy in other funds in the UK and Europe as that employed by LIM in the United States.

- With his long time partner, Nell Minow, Mr. Monks organized The Corporate Library (2000), an independent information, investment and rating service which provides corporate governance data and analysis to institutional and individual investors around the world.

- Mr. Monks was one of the founders and is Chairman of the Board of Governance 4 Owners in London, an activist investment fund.

Mr. Monks has written and spoken about corporate governance widely. With Nell Minow, he published *Power & Accountability* (Harper Collins, 1991), *Watching the Watchers* (Blackwell, 1996), and four editions of the standard case book, *Corporate Governance*, (Blackwell, 4th ed. 2008). Mr. Monks also published *The Emperor's Nightingale*, (Capstone, 1999), *The New Global Investors* (Capstone, 2001), *Corpocracy* (Wiley, 2007) and the novel *Reel and Rout* (Brook Street Press, 2004). He has published more than a hundred papers in publications around the world and has spoken about corporate governance on six continents. He has lectured widely, including to classes at Oxford, Cambridge, Harvard, Yale, Columbia, Stanford, University of California, Dartmouth, Chicago, and Northwestern. He has testified more than a dozen times before Congressional and Senate Committees on governance-related matters. He maintains a live relationship with corporate governance experts around the world on his web site - http://www.ragm.com - and is a frequent commentator in television, radio, magazine and newspaper coverage of corporate governance subjects.

He is referred to by *The Economist* and *Fortune* magazines as the leading shareholder activist and governance advocate in the world. He was the recipient of both the Award for Excellence in Corporate Governance from the International Corporate Governance Network ("ICGN") in 2002 and the Award for Outstanding Financial Executive from the Financial Management Association ("FMA") in 2007.

**Organization of Lens Governance Advisors**

Mr. Monks organized repeated efforts to improve corporate governance systems in the
United States, including prominently a self-nominated candidacy for the board of
directors of Sears Roebuck in 1991. Notwithstanding the successful effort to organize a
majority of shareholders to express their policy preferences in many companies, it
became clear to Mr. Monks that managements could largely ignore shareholder
expressions with impunity. Mr. Monks has become convinced that one of the best ways
to improve the governance of American corporations is through the settlement process of
securities lawsuits. This insight has been ratified by many other class action and
derivative litigators and by the United States Bankruptcy Court in enforcing the
comprehensive governance restatement proposed by former SEC Chairman Richard
Breeden in the MCI (formerly WorldCom) matter. Mr. Monks has been involved in
settlements with respect to Shell, British Petroleum, Citigroup and Nortel, among others.
This work has yielded landmark settlements at Sprint, Hanover Compressor, and
Broadcom.

## EXHIBIT B

### ROBERT A. G. MONKS
Ram Island Farm
Cape Elizabeth, Maine 04107

T: (207) 741-2795   F: (207) 767-1835
Email: ragmonks@ragm.com  Web: www.ragm.com

## EDUCATION

**Harvard College**, 1954, BA
**Trinity College**, Cambridge University, 1955
**Harvard Law School**, 1958, LLB

## PRIVATE SECTOR - Work Experience

**Practicing Lawyer** (specialized in corporate law)
Goodwin, Procter & Hoar, General Partner, 1958-65

**Management of Investments**
Gardner Associates (now Gardner & Preston Moss), Vice President, 1965-67 (a Boston-based company which manages money)

**Industrial Management**
C.H. Sprague & Son Company, President and CEO, 1968-72 (a New England based energy firm - coal, oil)
Sulpetro of Canada, Ltd., (natural gas) Finance Committee, Chairman, 1973-76

**Trust Company Management**
The Boston Company and The Boston Safe Deposit & Trust Co., Director, 1975-81 (a bank holding company that provides financial services to, among others, public and private pension funds)
    Finance Committee, Chairman, 1977-79
    Board of Directors, Chairman, 1979-81

**Corporate Governance**
Lens Governance Advisors, LLC, Founder, 2002 to present
Institutional Shareholder Services, President, 1985-1990
LENS Inc., President, 1990 to 2002
Hermes Lens Asset Management, Joint Deputy Chairman, 1998 to 2000
Hermes Asset Fund Management, Deputy Chairman 2000 to 2005
The Corporate Library, Director, 2000 to present
Governance 4 Owners, Chairman, 2005 to present

9

**Miscellaneous Corporate Directorships**
> Esterline, 1966-71 (NYSE)
> Westmoreland, 1965-70 (OTC)
> Jefferies & Company, Los Angeles, CA, Director, 1989-May 1990 (OTC)
> John Hancock Capital Growth Management, Inc., Boston, MA, Advisory
> Board Member, 1988-89
> Mitsubishi International Corporation, New York, Advisor, 1987-1991
> (Dec) (wholly owned subsidiary of Mitsubishi Corporation; listed on
> Tokyo Exchange)
> Tyco Laboratories, Inc., Exeter, NH, Director, 1985-1994 (Jan) (NYSE)
> Lambert Brussels Capital Corporation, New York, Director, 1983-May
> 1990 (affiliated corporations, listed Geneva, Brussels).
> Kennedy Group, Advisory Director - Jan 1993-December 1994

## <u>PUBLIC SECTOR</u> - Work Experience

**Vice President Bush's Commission on Deregulation**, 1981-84

**Federal Corporation (Presidential Appointment, Senate Confirmation)**
> Synthetic Fuels Corporation, Director, 1981-84

**Federal Government (Management of Pension Benefit Plans)**
> U.S. Department of Labor, Administrator of the Office of Pension &
> Welfare Benefit Programs ("ERISA"), 1984-85

**Federal Employee Retirement System (Presidential Appointment)**
> Federal Retirement Thrift Investment Board, Member - 1986-88

**State Government (Governor's Appointment)**, Chairman
> Committee to Study the Maine State Retirement System, 1987-88
>
> Committee to Study the Maine State Retirement System, 1993-94

**State Government (Senate Appointment)**, Committee Member
> California Senate Commission on Corporate Governance, Shareholder
> Rights and Securities Transactions, 1986

**State Government (Governor's Appointment)**, Administrator of Office of
Energy Resources (Maine), 1973-74